[Cite as *Wheeler v. Armbruster*, 2023-Ohio-3840.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

Angela Wheeler

     Appellee

v.

Gregory Armbruster, Jr.

     Appellant

Court of Appeals No.  S-22-025

Trial Court No.  22 CV 54


**DECISION AND JUDGMENT**

Decided:  October 13, 2023

* * * * *

Brent L. English, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Gregory Armbruster, Jr., appeals from the judgment of the Sandusky County Court of Common Pleas, adopting the magistrate's decision and order of protection filed August 25, 2022, and dismissing appellant's objections thereto.  For the reasons that follow, the trial court's judgment is affirmed.

**Statement of the Case**

{¶ 2} This appeal challenges the validity of a civil stalking protection order (CSPO) issued against appellant, for the protection of A.W., A.W.'s husband, and A.W.'s children.

{¶ 3} A.W. is a caseworker for the Sandusky County Department of Job and Family services ("the agency"). She interacted with appellant after appellant's two male children were removed from his care by the agency. This case involves two telephone conversations between A.W. and appellant. The first took place on December 23, and the second took place on January 19, 2022.

{¶ 4} As a result of these telephone conversations, on January 20, 2022, A.W. filed a petition for a CSPO against appellant in the Sandusky County Court of Common Pleas. On the same day, a magistrate granted an ex parte protection order in favor of A.W., her husband, and her three children.

{¶ 5} On May 23, 2022, a full hearing was held before a magistrate. A.W., appellant, and several other witnesses testified. The magistrate issued an initial decision on August 3, 2022, followed by an "amended magistrate's decision" on August 25, 2022, granting the CSPO in favor of all of the petitioners.

{¶ 6} Appellant filed preliminary objections to the amended decision on September 8, 2022. A transcript of the May 23, 2022 proceedings was filed on September 20, 2022, and appellant filed supplemental objections on October 11, 2022.

2.

On October 18, 2022, the trial court overruled all of appellant's objections. Appellant timely followed an appeal of the trial court's decision.

**Statement of Facts**

**December 23, 2021 Telephone Call**

**{¶ 7}** At the hearing, A.W. testified that on December 23, 2021, while she was driving her car in Fremont, Ohio, she received a cell phone call from a number that she did not recognize. She stated that when she answered the phone, appellant, who was the caller, said to her, "I betcha didn't know I had your cell phone number, did you?" She testified that appellant proceeded to yell, demanding to know where his kids were and venting about his Children Services case with her. She stated that she tried to get the call "off of her car," since her minor child was present with her in the vehicle, and that appellant told her that if she hung up the phone, he was going to give out her number and "have 20 persons" calling her. She testified that she tried to talk to him, but that she "couldn't get a word in edgewise." She further testified that appellant told her that he was on his way to Port Clinton and that he was going to be sitting in her driveway when she got home. A.W. asked him not to do that and told him that he needed to call the agency in order to get answers to his questions about his children. Appellant asked if she was working "right now," and A.W. answered that she was not, but that appellant could speak to the person who was on call. She stated that she told appellant that she would call the supervisor who was on call to try to get answers to his questions. According to

3.

A.W., appellant continued to yell and stated that if A.W. was going to "ruin" his family, he was going to "ruin" hers. After hanging up with appellant, A.W. contacted the supervisor, and the supervisor advised her to make a police report, which she immediately did.

{¶ 8} A.W. testified that during the course of the call, appellant called her a bitch and a liar. She further testified that she was in fear for her family, because appellant knew where she lived, and knew that she was not at home during the phone call. She stated that at the time of her call, three of her children, ages 17, 12, and 11 were at home, while her husband was at work.

## January 19, 2022 Telephone Call

{¶ 9} A.W. testified that on January 19, 2022, she arrived at her office and learned that appellant had called the agency a couple of times, demanding to talk to her. A.W. returned the call and put appellant on speaker phone. Appellant, who had called to discuss a supervised visitation issue regarding one of his children, once again became angry with A.W. In addition to screaming at her and calling her a "fucking liar," he told her that she was "fucking with his family" and now he was going to "fuck with" hers, and that if she was going to "go after" his family, then he was "coming after" hers. He stated that he had gotten access to A.W.'s Facebook account and knew that her husband, M.W., was a pedophile, and that A.W. had "two girls." A.W. confirmed that she has two daughters. She also confirmed that appellant knew her husband's name -- a fact which

4.

concerned A.W., because she was not connected with her husband on Facebook or on any other social media platform. A.W. tried to tell appellant that if he was unhappy with an agency decision, he could go to court and file a motion, or he could even speak to an agency supervisor. Appellant told A.W. that he would be at the agency in 20 minutes. A.W. did not know what his purpose in going to the agency would be, because at this point in the conversation they were not having a "productive conversation," "nothing about work." When appellant continued to yell, A.W., crying, hung up the phone.

{¶ 10} According to A.W., "[t]his wasn't about professional," [sic] "[t]his wasn't about him having an open case with Children Services," "this was about me," "about my family, about my kids." A.W. stated that she was in fear because appellant had "done his research," and she was in fear that appellant would follow his words with actions. A.W. testified that in her past dealings with appellant, he had talked about his intense dislike for her, but he had never made mention of her family. She further testified that in her nearly eight years at the agency, this was the first time anyone threatened her family, and that she considered appellant's behavior in this case to be at a "different level."

{¶ 11} As a result of the two phone calls, A.W. installed security cameras on her home and downloaded apps for Life 360, "just to make sure everybody knows where everybody's at."

{¶ 12} Leslie Adams, A.W.'s co-worker at the agency, testified that she overheard A.W.'s January 19, 2022 phone call with appellant, and that appellant was upset and

talking about his "visitations with his children." He was yelling and screaming, and proceeded to say that if A.W. was going to "fuck with" his family, he was going to "fuck with" hers. In addition, "he proceeded to say information that he knew about [A.W.'s] husband * * * and ask[ed] about how she liked it."

{¶ 13} Adams stated that she was in fear for A.W. and her family, "due to [appellant's] having knowledge about [A.W.'s] family and giving names of her family members." Adams testified that her fear was based upon the conversation that she heard as well as upon her experience and training related to hostile families.

## Appellant's Testimony

{¶ 14} At the hearing, appellant conceded that "on numerous occasions" he called A.W. a "lying bitch." He further testified that although he has "an idea" about where A.W. lives, he never told her that he would be in her driveway when she got home. He also denied ever mentioning A.W.'s children.

## Assignments of Error

{¶ 15} Appellant asserts the following assignments of error on appeal:

I. The trial court committed reversible error by granting a civil stalking protection order against the Appellant when the judgment was against the manifest weight of the evidence inasmuch as the Appellee failed to prove by a preponderance of the evidence that he engaged in a pattern of

conduct knowingly causing Appellee to fear for her safety or to endure mental distress.

II. The trial court committed reversible error by granting a civil stalking protection order in favor of petitioner's family and household members and against the Appellant when the judgment was against the manifest weight of the evidence inasmuch as none of the requirements for such a protection order were proved.

**Analysis**

{¶ 16} Appellant's assignments of error are related and will be discussed together. Appellant asserts that A.W. failed to prove the need for a CSPO for herself and for her family by a preponderance of the evidence and/or that the CSPO was against the manifest weight of the evidence.

{¶ 17} A.W., her husband, and her children filed a petition for a CSPO pursuant to R.C. 2903.214, which provides:

(C) A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member, by filing a petition with the court. The petition shall contain or state all of the following:

(1) An allegation that the respondent is eighteen years of age or older and engaged in a violation of section 2903.211 of the Revised Code against the

person to be protected by the protection order * * *, including a description of the nature and extent of the violation[.]

{¶ 18} A petition under R.C. 2903.214 alleges that a violation of R.C. 2903.211, menacing by stalking, has occurred. R.C. 2903.211 provides:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

{¶ 19} As used in the statute, the term "pattern of conduct" means "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). "In determining what constitutes a pattern of conduct, courts take every action into consideration 'even if some of the person's actions may not, in isolation, seem particularly threatening.'" *Krzystan v. Bauer*, 6th Dist. Ottawa No. OT-15-039, 2017-Ohio-858, ¶ 18, quoting *Guthrie v. Long*, 10th Dist. Franklin No. 04AP-913, 2005-Ohio-1541, ¶ 12. (Additional citation omitted.).

{¶ 20} "[T]he culpable mental state for the issuance of a CSPO is 'knowing.'" *Krzystan* at ¶ 19. "A person acts knowingly, regardless of purpose, when the person is

8.

aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 21} R.C. 2901.01(A)(3) defines "physical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." "Explicit or direct threats of physical harm are not necessary to establish a violation of R.C. 2903.211(A)[;] [r]ather, the test is whether the offender, by engaging in a pattern of conduct, knowingly caused another to believe the offender would cause physical harm to him or her." *Krzystan* at ¶ 17, citing *Kramer ex rel. Kramer v. Kramer*, 3d Dist. Seneca No. 13-02-03, 2002-Ohio-4383, ¶ 15. Again, "every action by the accused must be taken into consideration, even if some of the actions may not seem threatening in and of themselves." *Nolder v. Nolder*, 7th Dist. Columbiana No. 22 CO 0027, 2023-Ohio-2371, ¶ 19.

{¶ 22} "Mental distress" is defined under R.C. 2903.211(D)(2) as either of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

9.

**{¶ 23}** This court has interpreted that R.C. 2903.211(A)(1) "does not require that the victim actually experience mental distress, but only that the victim believes the stalker would cause mental distress or physical harm." (Quotation omitted.) *Fondessy v. Simon*, 6th Dist. Ottawa No. OT-11-041, 2013-Ohio-3465. ¶18. "Moreover, the testimony of the victim herself as to her fear is sufficient to establish mental distress." *Id.*, citing *State v. Horsley*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208.

**{¶ 24}** We note that calling someone a "bitch," without more, cannot support a CSPO petition. *Krzystan* at 21. "'[A] few instances of name-calling, snide remarks, dirty looks, and perhaps some rude gestures, but [without] threats of physical harm' do not justify a menacing by stalking finding or the issuance of a CSPO." *Id.*, quoting *Darling v. Darling*, 7th Dist. Jefferson Nos. 06JE6 and 06JE7, 2007-Ohio-3151, ¶ 23. "While calling someone a 'bitch' may be rude or boorish, 'R.C. 2903.211 and R.C. 2903.214 were not enacted for the purposes of alleviating uncomfortable situations, but to prevent the type of persistent and threatening harassment that leaves victims in constant fear of physical danger, or mental distress.'" *Krzystan* at ¶ 2, quoting *Holloway v. Parker*, 3d Dist. Marion No. 9-12-50, 2013-Ohio-1940, ¶ 35.

**{¶ 25}** When reviewing the issuance of a CSPO on appeal, this court applies the civil manifest weight of the evidence standard. *Krzystan* at ¶ 12. "Under this standard, 'judgments supported by some competent, credible evidence going to all the essential

10.

elements of the case will not be reversed by a reviewing court.'" *Id.*, quoting *C.E. Morris v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 26} "For a trial court to grant a CSPO, the petitioner must show, by a preponderance of the evidence, that the complained of conduct violates the 'menacing by stalking' statute." *Krzystan* at ¶ 16, citing *Striff v. Striff*, 6th Dist. Wood No. WD-02-031, 2003-Ohio-794, ¶ 10. Appellant's argument on appeal is that he did not engage in menacing by stalking.

{¶ 27} Specifically, appellant denies that A.W. showed by a preponderance of the evidence that he knowingly caused her to believe that he would cause her physical harm or mental distress. He states that "it is uncontroverted that [he] never went to Port Clinton, Ohio or otherwise interacted with A.W." He further states that "[w]hile he was outspoken and perhaps bluntly reviewed [sic] or boorish, the case law is clear that words alone are insufficient as a matter of law to constitute an incident giving rise to a pattern of conduct sufficient to issue a CSPO." We disagree with appellant's statement of the law.

{¶ 28} While merely calling someone a "bitch" does not support a CSPO petition, threatening words that cause a person to believe that the offender will cause mental distress or physical harm to the other person will, in fact, suffice. *See Nolder* (where ex-husband made 40 phone calls over the course of two days in which he threatened that "things" would "get ugly or bad" for the petitioner, that he would take the petitioner's children away, and that there would be "consequences" if she did not pick up the phone,

11.

evidence supported the conclusion that he threatened the petitioner and that she believed he would cause her physical harm.)

{¶ 29} Here, there was evidence that during the first phone call on December 23, 2021, appellant not only called A.W. a bitch, but also threatened to be in her driveway in Port Clinton when she got home. There is also evidence that he taunted her about his having her cell phone number and evidence of his threatening her that if she was going to "ruin" his family, then he was going to "ruin" hers. A.W. specifically testified as to her fear that appellant would cause her and/or her family physical harm. Thus, the record establishes that on December 23, 2021, appellant engaged in an incident of conduct such that he knowingly caused A.W. and her family to believe that appellant would cause them physical harm, and such that A.W. suffered substantial mental distress due to appellant's conduct.

{¶ 30} There is also evidence that appellant, on January 19, 2022, while on a second phone call with A.W., stated that she was "fucking with his family" and now he was going to "fuck with" hers, and that if she was going to "go after" his family, then he was "coming after" hers. In addition to evidence that appellant called A.W. a "fucking liar," there is evidence that appellant told A.W. that he had gotten access to her Facebook account, that he referred to the fact that she has two daughters, and that he had somehow learned her husband's name. Both A.W. and Leslie Adams testified that appellant's behavior was of unique concern, because appellant specifically mentioned not just A.W.,

12.

but also her husband and several of her children, and because he revealed that he had done research on the family as a whole. A.W. further testified that appellant had stated during their conversation that he would be at the agency in 20 minutes, despite the fact that that point in the conversation had nothing to do with work. Accordingly, the record establishes that on January 19, 2022, appellant engaged in an incident of conduct such that he knowingly caused A.W. and her family to believe that appellant would cause them physical harm, and such that A.W. suffered substantial mental distress due to appellant's conduct.

{¶ 31} In addition to the foregoing, A.W. testified that as a result of the two phone calls, security cameras had been installed on the home that she shared with her family and apps for Life 360 had been downloaded, "just to make sure everybody knows where everybody's at."

{¶ 32} The record amply establishes that appellant engaged in a pattern of conduct such that A.W. and her family believed that he would cause them mental distress and/or physical harm, and such that appellant intended for his statements to be taken thusly.

## Conclusion

{¶ 33} As the need for the CSPO was supported by a preponderance of the evidence, and as the CSPO was not against the manifest weight of the evidence, the

judgment of the Sandusky County Court of Common Pleas is affirmed. Appellant is to

pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.            _____
                                              JUDGE

Myron C. Duhart, P.J.            

                                _____
Charles E. Sulek, J.                          JUDGE
CONCUR.

                                _____
                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.